NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN YONG TANG and FARIS AL KOOHEJI, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITIC CAPITAL HOLDINGS LTD., et al.,<br><br>Defendants. | Civil Action No. 21-17008-JXN-AME<br><br>OPINION |

**ESPINOSA**, Magistrate Judge

    This matter comes before the Court on the defendants' joint motion to transfer the action to the United States Bankruptcy Court for the District of Delaware or, alternatively, to the United States District Court for the District of Delaware. Plaintiffs oppose the motion. The Honorable Julien X. Neals, U.S.D.J., referred the motion to transfer to this Court pursuant to 28 U.S.C. § 636(a), which authorizes a magistrate judge to "hear and determine any pretrial matter before the court," with certain inapplicable exceptions. The Court has considered the parties' written submissions and, in its discretion, rules without oral argument. *See* Fed. R. Civ. P. 78. For the following reasons, the motion is granted and the Court accordingly transfers this action to the District of Delaware pursuant to 28 U.S.C. § 1412.

**I.     BACKGROUND**

    This civil action arises out of an alleged conspiracy to deprive certain shareholders of their equity in GNC Holdings, Inc. ("GNC") for Defendants' financial gain. GNC is a formerly publicly-traded Delaware corporation, which maintained a principal place of business in

Pittsburgh, Pennsylvania at the time relevant to this suit. It was engaged in the business of selling nutritional supplements and marketing other wellness products and services. According to the operative Second Amended Complaint (the "Complaint"), the scheme involved the deliberate mismanagement of GNC to engineer a situation in which GNC was purportedly unable to pay its debts and thus forced to file for bankruptcy, all with the aim of enriching GNC executives and facilitating the acquisition of GNC's assets by its majority shareholder Harbin Pharmaceutical Group ("Harbin"), allegedly controlled by defendant CITIC Capital Holdings Ltd. ("CITIC"). The Complaint alleges the coordinated activities of the various Defendants formed an unlawful enterprise, within the meaning the Racketeering Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C. § 1961, which "functioned for the purpose of allowing CITIC to acquire GNC in its entirety through unlawful activities and enrich CITIC, [its CEO] Zhang, along with GNC Management individual defendants, by working together to avoid refinancing measures which would have benefitted all shareholders, while maximizing their financial benefit." (Compl. ¶ 169.)

### A. The Parties

Plaintiffs John Yong Tang, a citizen of New Jersey, and Faris al Kooheji, a citizen of Bahrain, (collectively "Plaintiffs") were each minority shareholders of GNC Class A common stock. Defendants are entities and individuals involved in the alleged conspiracy. For purposes of this motion, Defendants can generally be identified by three groupings: CITIC; the GNC directors and executives ("GNC Management"); and Evercore, Inc. ("Evercore").[1] According to the Complaint, CITIC is a state-owned Chinese investment company that controls Harbin. GNC

---

[1] The CITIC defendants include CITIC Capital Holdings Ltd., Hsing Chow, Yichen Zhang, and ZT Biopharmaceutical LLC. The GNC Management defendants include Kenneth A. Martindale, Tricia K. Tolivar, Michele S. Meyer, Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott, and Robert F. Moran. The Evercore defendants include Evercore Inc. and Gregory Berube.

Management consists of the various company executives who perpetrated the alleged scheme. Evercore advised GNC on matters of debt restructuring and bankruptcy.

### B.    The Alleged Scheme

According to the Complaint, CITIC's efforts to acquire GNC date back to 2017 but were met with resistance from GNC Management. (Compl. ¶¶ 41-44.) The Complaint alleges that, although CITIC had been able to purchase an approximately 40% stake in GNC, through Harbin, it was unsuccessful in its alleged goal of acquiring the company in its entirety. (*Id.* ¶ 44.) The Complaint also alleges that "CITIC and [its CEO] Zhang devised and implemented an unlawful scheme, aiming at acquiring GNC at the expense of Plaintiffs and other minor shareholders through a sequence of deceiving strategic moves." (*Id.* ¶ 45.)

The "strategic moves" taken by Defendants between approximately 2018 and 2021, prior to the bankruptcy filing, are detailed in the Complaint, over many enumerated paragraphs. (*Id.* ¶¶ 46-140.) Briefly stated, they consisted of increasing CITIC's control over GNC's board, reducing GNC's liquidity and overall financial health, driving away potential investors, and narrowing GNC's options for restructuring its sizable debt. According to the Complaint, these actions orchestrated a situation in which GNC would falsely claim it had no choice but to file for bankruptcy to manage its financial liabilities. Indeed, according to Plaintiffs, "GNC Management [had] been planning for bankruptcy for a long time, waiting for an opportunity to implement the bankruptcy plan to hand the Company to the secured lender in exchange for a monetary benefit for themselves, with the full knowledge such acts would cause direct damage to Plaintiffs and other minority shareholders." (*Id.* ¶ 90.)

The Complaint states that, in the beginning of 2020, GNC Management, CITIC and Evercore "started working to implement the Chapter 11 filing." (*Id.* ¶ 91.) It alleges Defendants

used the accelerated debt obligation of one of GNC's loans as an opportunity to carry out their ultimate plan of selling GNC's assets to CITIC through the bankruptcy process. (*Id.* ¶¶ 85-94.) Under the "Springing Maturity Covenant" of GNC's "Tranche B-2" loan, the Complaint states, the loan became due on May 16, 2020, if certain conditions were not satisfied. (*Id.* ¶ 88.) Plaintiffs allege that rather than work to avoid the springing maturity, GNC Management allowed the acceleration covenant to be triggered, resulting in an obligation of approximately $109.1 million, which GNC claimed it lacked the cash to pay. (*Id.* ¶¶ 89-92.)

According to the Complaint, alternatives to bankruptcy were possible but were left unexplored by GNC Management, which together with the other Defendants, had "conspired to file for the sham bankruptcy" to realize the "most monetary benefits" for themselves. (*Id.* ¶ 107.) The Complaint alleges that beginning in about April 2020, Plaintiffs made concerted efforts to protect the minority shareholders' interests and prevent the bankruptcy filing. (*Id.* ¶ 114.) They communicated repeatedly with GNC Management and Evercore, presenting alternatives for dealing with GNC's liquidity issues and urging it not to file for bankruptcy. (*Id.* ¶¶ 115-129.) The Complaint further alleges the Plaintiffs received false assurances in response. (*Id.* ¶¶ 116, 123, 129.) In May 2020, GNC issued a communication stating it was exploring options "to address its capital structure – which has been exacerbated by the current pandemic" and advising those options included "filing for voluntary protection under Chapter 11 of the U.S. Bankruptcy Code." (*Id.* ¶ 133.) GNC Management negotiated a short extension of the Tranche B-2 loan's springing maturity date, to June 30, 2020, but according to the Complaint, did so only to create the impression it was working on a solution to address its debt obligations. (*Id.* ¶ 140.)

The alleged scheme to facilitate CITIC's acquisition of GNC assets culminated with GNC's bankruptcy case, which Plaintiffs assert "would completely wipe out the GNC shareholder" but

4

"greatly benefit Defendant ABC Company, GNC Management and Evercore that collect significant amount of fees." (*Id.* ¶ 142.)

        **C.**        **The GNC Bankruptcy Case**

On June 23, 2020, GNC filed a petition for Chapter 11 bankruptcy in the Bankruptcy Court for the District of Delaware, docketed as *In re GNC Holdings, Inc., et al.*, No. 20-11662 (KBO) (the "GNC Bankruptcy Case").[2] (*Id.* ¶ 141.) Plaintiffs allege Defendants' unlawful scheme continued throughout the GNC Bankruptcy Case and involved not only mail and wire fraud in communications with shareholders and potential investors but also misuse of the Chapter 11 proceedings and fraud on the Delaware Bankruptcy Court. (*Id.* ¶ 171.) For example, Plaintiffs allege that, during the court-overseen auction and sale of GNC's assets, Defendants manipulated financial data to deter bidders other than CITIC, through its wholly-owned company Harbin. The Complaint states:

> In order to ensure that Defendant CITIC group, or Defendant GNC Management and secured lenders, who had agreed to split the new GNC 10/90, obtain the GNC, Defendants Zhang, CITIC, CITIC group, GNC Management, Evercore and Berube [sic] to provide manipulated financial data projecting the disappointing GNC's financial performance in the future in order to deter the potential bidders. From July 2020 to September 2020, under the direction of Defendants CITIC, Zhang, Martindale and Tolivar, Defendants Evercore and Berube have repeatedly sent emails to potential bidders that contained fabricated false financial data and access to the virtual data room (the "VDR"), which was filled with manipulated GNC financial information to purposefully deter the potential bidder from participating in the public auction.

(*Id.* ¶ 156.) Thus, Plaintiffs contend Defendants induced the Delaware Bankruptcy Court, through deceit, to ultimately approve the sale as a good faith, non-collusive transaction.

---

[2] Consistent with its prerogative to consider matters of public record, this Court takes judicial notice of the GNC Bankruptcy Case and relevant items filed on the docket of that case. *See Liberty Int'l Underwriters Canada v. Scottsdale Ins. Co.*, 955 F. Supp. 2d 317, 325 (D.N.J. 2013) (holding the court may take judicial notice of matters of public record, including "proceedings in other courts that relate to matters at issue.").

On September 18, 2020, the Delaware Bankruptcy Court entered an order approving the sale of substantially all of GNC's assets to Harbin (the "Sale Order"). (*See* Reiss Decl., Ex. 3.) As recited in the Sale Order, the Delaware Bankruptcy Court concluded that GNC had "demonstrated good, sufficient, and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Sale . . . prior to and outside of a plan of reorganization" and further concluded that among the sound business reasons given, GNC would use the sale proceeds to pay debts consistent with its Chapter 11 Plan of Reorganization. (Sale Order ¶ J.) It found that Harbin's purchase of GNC's assets was a good faith transaction (*id.*), which resulted from "the highest or otherwise best offer for the Assets and [that it] represents a fair and reasonable offer to purchase the Assets under the circumstances." (*Id.* ¶ O). The Delaware Bankruptcy Court expressly found that "none of the Debtors, the Buyer, any other party in interest, or any of their respective representatives . . . had acted in bad faith or in any improper or collusive manner with any entity in connection therewith." (*Id.* ¶ L.) Similarly, referring to the sale transaction documents, the Sale Order stated that none of the parties to those documents "are consummating the Transaction with any fraudulent or otherwise improper purpose." (*Id.* ¶ R.) Noting that, prior to its entry, an opportunity for filing objections had been provided, the Sale Order denied any objection not previously withdrawn or resolved and, further, stated that "[t]hose parties who did not object to the Motion or the entry of this Sale Order in accordance with the Bidding Procedures Order, or who withdrew their objections thereto, are deemed to have consented to the relief granted herein for all purposes …." (*Id.* ¶ 3.) By its terms, the Sale Order is binding on, among others, "all holders of equity interests in the Debtors," that is, on GNC and its related subsidiaries as identified in the Sale Order. (*Id.* ¶ 7.) The Delaware

Bankruptcy Court retained jurisdiction to "interpret, implement, and enforce" the Sale Order's terms and provisions. (*Id.* ¶ 54.)

On October 14, 2020, the Delaware Bankruptcy Court confirmed GNC's Chapter 11 Plan of Reorganization (the "Plan").[3] (*See* Reiss Decl., Ex. 4.) The Plan permitted GNC to wind down its estate following the consummation of the asset sale to Harbin, pursuant to the Sale Order. Article IX of the Plan sets forth releases, injunctions, and exculpatory provisions, which were approved and incorporated by reference in the October 14, 2020 Confirmation Order.[4] (*See id.* Ex. 2.) In relevant part, the Plan states "Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code . . . the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Equity Interests and Claims of any nature whatsoever, including any interest accrued on Claim from and after the Petition Date . . . against the Debtors, the Reorganized Debtors or any of their assets or properties…." (Plan, Art. IX.A.) The Plan further provides that certain "Exculpated Parties" as identified therein "shall neither have nor incur any liability to any person or entity for any claims, causes of action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the confirmation or consummation of this Plan" and various related documents. (*Id.* Art. IX.D.) The Delaware Bankruptcy Court also retained jurisdiction to "resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in

---

[3] The Plan's full title is the "Seventh Amended Joint Chapter 11 Plan of Reorganization of GNC Holdings, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code."

[4] In a separately-filed motion to dismiss, certain Defendants have noted that, in addition to other grounds raised in the motion, "Plaintiffs' claims are also subject to dismissal, at least in part, on exculpation grounds," citing both the Plan and the Delaware Bankruptcy Court's Order confirming the Plan. (*See* ECF 43-1, at 32 n. 28.) That motion, and two other motions to dismiss, are currently under administrative termination, pending the outcome of this motion to transfer. (*See* ECF 49.)

connection with the interpretation or enforcement of the Plan, the Confirmation Order, or the Plan Administrator Agreement." (*Id.* Art. X.) After confirmation of the Plan, the GNC Bankruptcy Case was closed as to various non-lead debtors but, to date, remains open for administration of the Plan as to certain liquidating debtors, including GNC (now known as "Vitamin OldCo. Holdings, Inc.").

### D.     This Action

Plaintiffs filed this putative class action lawsuit on September 15, 2021, in the District of New Jersey, individually and on behalf of "all similarly situated GNC minority shareholders of record of GNC Class A Common Stock . . . as of April 21, 2020 when Plaintiffs announced the investigation into the GNC matter." (Compl. ¶ 2.) According to the Complaint, the GNC Bankruptcy Case was a means to accomplish Defendants' unlawful objectives. It states: "Defendants' unlawful schemes converged at the fabrication and completion of the sham Chapter 11 bankruptcy filing on June 23, 2020." (*Id.* ¶ 176.) Plaintiffs allege that, by means of the "racketeering activity" in which Defendants engaged from "February 2018 through October 7, 2020"—the date Plaintiffs contends the sale of GNC's assets was completed—Defendants accomplished their goal of allowing CITIC to seize GNC's assets and collecting significant fees and other financial gain for the benefit of GNC Management and Evercore, at the expense of wiping out the minority shareholders' equity interests. The Complaint states: "The RICO Defendants' goal was to preserve, not to destroy, the Company assets for themselves through a sham bankruptcy filing. The RICO Defendants have targeted Plaintiffs and other minority shareholders [of GNC] . . . Plaintiffs have incurred injury to their property (including, but not limited to their interests in GNC) by reason of Defendants [sic] violations of 18 U.S. Code § 1962." (*Id.* ¶ 181.)

Plaintiffs allege that, as a result of their racketeering and other unlawful activities, Defendants have caused injury to Plaintiffs, including the loss of their equity interests in GNC. The ten-count Complaint asserts claims for violation of the federal RICO statute, violation of the New Jersey RICO statute, common law fraud, conspiracy to defraud, breach of fiduciary duty, conversion, negligence, and "aiding and abetting a conspiracy." (*See, generally*, Compl., Counts One – Ten.) Plaintiffs' prayer for relief seeks, among other things, an order directing Defendants to divest themselves of any interest in the enterprise.

## II.   DISCUSSION

### A.   Legal Standard

In this motion to transfer venue, Defendants primarily rely on 28 U.S.C. § 1412, which governs the transfer of actions in which bankruptcy jurisdiction exists. They argue this case can, and should, be transferred directly to Delaware Bankruptcy Court, or to Delaware District Court for referral to the Bankruptcy Court, pursuant to Section 1412, contending "Plaintiffs' claims are deeply intertwined with the GNC Bankruptcy Case in nearly every respect" (Reply at 1) and thus there is both "arising in" and "related to" bankruptcy jurisdiction here under 28 U.S.C. § 1334. (Defs. Mem. at 12-18.) Alternatively, should the Court determine Section 1412 to be inapplicable to this action, Defendants maintain transfer is warranted under 28 U.S.C. § 1404(a), which generally applies to transfers of civil actions from one federal venue to another, more convenient forum.[5] Plaintiffs argue bankruptcy jurisdiction does not exist, making Section 1412

---

[5] Section 1404(a) applies only where both the transferor and transferee courts constitute proper venues under the venue provisions of Section 1391. *Amtrust at Lloyd's Ltd. v. Breslin*, No. 14-7761, 2015 WL 1399588, at *3 (D.N.J. Oct. 16, 2013) (citing *Osteotech, Inc. v. GenSci Regeneration Scis., Inc.*, 6 F. Supp. 2d 349, 357 (D.N.J.1998)). Although Defendants move, in the alternative, for transfer under Section 1404(a), they expressly state in their motion papers that they do not concede the District of New Jersey is a proper venue for this action. Because the Court does not reach Defendants' alternative basis for transfer, it does not resolve the question of whether Section 1404(a) would apply to this motion.

inapplicable, and further argue that under either statute's transfer analysis, Defendants fail to satisfy their burden of demonstrating a transfer is warranted.

Thus, the threshold question on this motion concerns which transfer statute governs this motion. The Court concludes Section 1412 applies.

Section 1412 provides: "A district court may transfer a case or proceeding under Title 11 to a district court for another district, in the interest of justice *or* for the convenience of the parties." 28 U.S.C. § 1412 (emphasis added); *see also Garcia v. Chrysler Group LLC*, No. 12-1797, 2015 WL 12857080, at *3 (D.N.J. Mar. 9, 2015) (underscoring that, in contrast to Section 1404(a)'s requirement that a transfer serve both the interests of justice and convenience, Section 1412's disjunctive language allows transfer for either reason). Bankruptcy jurisdiction under 28 U.S.C. § 1334 extends not only to cases "arising under" Title 11 but also encompasses those that "arise in" or are "related to" cases under Title 11 of the Bankruptcy Code. *U.S. Vision, Inc. v. AS IP Holdings, Inc.*, No. 11-1892, 2012 WL 243358, at *2 (D.N.J. Jan. 25, 2012) (citing *In re Resorts Int'l, Inc.*, 372 F.3d. 154, 161 (3d Cir. 2004)); *In re G-I Holdings, Inc.*, 564 B.R. 217, 251 (Bankr. D.N.J. 2016), *aff'd*, 2017 WL 1788656 (D.N.J. May 5, 2017). Following Third Circuit jurisprudence, courts in this district have consistently held that "although Section 1412 speaks only of proceedings 'under' the Bankruptcy Code, it is also applicable for determining whether a proceeding 'related to' a bankruptcy case may be transferred." *Abrams v. Gen. Nutrition Cos., Inc.*, No. 06-1820, 2006 WL 2739642, at *8 (D.N.J. Sept. 25, 2006) (quoting *Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1212 (3d Cir. 1991)); *see also Miller v. Chrysler Group, LLC*, No. 12-760, 2012 WL 6093836, at *3 (D.N.J. Dec. 7, 2012) (concluding, based on *Maritime Electric*, that Section 1412 governed the transfer motion, even though action did not arise "under" Title 11, observing "the Third Circuit found that § 1412 is

the appropriate method for transfer of cases that are 'related to' a bankruptcy proceeding."); *Perno v. Chrysler Group LLC*, No. 10-5100, 2011 WL 868899 (D.N.J. Mar. 10, 2011); *U.S. Vision*, 2012 WL 243358, at *2 (stating the transfer provision of Section 1412 applies to actions "related to" bankruptcy proceedings).

A matter "arises in" a bankruptcy case where the claims "by their nature . . . could only arise in the context of a bankruptcy case." *In re Seven Fields Dev. Corp.*, 505 F.3d 237, 260 (3d Cir. 2007); *see also G-I Holdings*, 564 B.R. at 251 ("Courts generally hold that the bankruptcy court has 'arising in' jurisdiction *only* if the proceeding would not exist outside the bankruptcy.") (emphasis in original). An action is "related to" a post-confirmation bankruptcy proceeding where "there is a close nexus to the bankruptcy plan or proceeding." *Resorts Int'l*, 372 F.3d at 166. "Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id.* at 167; *see also Miller*, 2012 WL 6093836, at *6-7 (finding "related to" bankruptcy jurisdiction, in the context of a motion to transfer under Section 1412, in an action alleging breach of contract, misrepresentation, and fraud involved interpreting a bankruptcy sale order).

Here, the Complaint makes clear that this action has a close nexus to the GNC Bankruptcy Case and is therefore related to that proceeding, within the meaning of Section 1334. Plaintiffs allege Defendants devised and/or participated in a scheme to enrich themselves by, among other things, thwarting efforts to manage GNC's debt, deliberately driving the company towards insolvency, and then manipulating the bankruptcy process for their own gain—in the form of acquiring GNC's assets and/or obtaining substantial monetary compensation. In opposing this motion to transfer and, specifically, in arguing Section 1412 does not apply, Plaintiffs maintain their claims are distinct from the GNC Bankruptcy Case for two principal

reasons: one, this action involves different parties than the GNC Bankruptcy Case; and two, the claims here arise out of pre-bankruptcy conduct. Neither is availing. Plaintiffs cite no authority for their contention that an identity of parties between a bankruptcy proceeding and a separately-filed civil action is a requirement to establish "related to" jurisdiction under Section 1334. To the contrary, "related to" jurisdiction can extend to actions against third parties, that is, proceedings that do not name the bankruptcy debtor. *In re Zinchiak*, 406 F. 3d 214, 226-27 (3d Cir. 2005) (finding bankruptcy court properly exercised "related to" jurisdiction over state law deficiency petition brought against non-debtor spouse). More important, their assertion that their claims arise only out of conduct "before the actual time of 'petition'" (Opp. Br. at 19) is belied by the allegations of the Complaint itself. Although the alleged scheme involved numerous steps pre-dating the GNC Bankruptcy Case, the Complaint expressly states it culminated with the filing of the "sham" Chapter 11 proceedings. According to the Complaint, the GNC Bankruptcy Case was an integral part of the alleged scheme to harm shareholders by improperly eliminating their equity in GNC. Defendants accomplished this act and alleged injury through the Sale Order, in which the Delaware Bankruptcy Court approved the sale of GNC's assets to Harbin. Thus, on their face, Plaintiffs' claims are necessarily "related to" the GNC Bankruptcy Case. *See Miller*, 2012 WL 6093836, at *5 (finding, in the context of a Section 1412 transfer motion, "related to" bankruptcy jurisdiction in an action for breach of contract, misrepresentation, and fraud, which involved interpreting a bankruptcy sale order).

      Despite Plaintiffs' arguments to the contrary, the claims asserted in this action do require interpretation and/or enforcement of the Sale Order and Plan. In the Sale Order, the Delaware Bankruptcy Court found the asset sale to be a bona fide good faith transaction, in which neither GNC or Harbin "acted in bad faith or in any improper or collusive manner" or sought to

consummate the sale for a fraudulent or other improper purpose. (Sale Order ¶¶ L, R.) Yet, the Complaint in this action repeatedly assails the entire bankruptcy proceeding as a "sham" based on the collusive activities of Defendants, including their coordinated effort to manipulate information on which the Sale Order is based. Contrary to the findings made in the Sale Order, Plaintiffs allege the sale resulted from Defendants' deliberate campaign to provide false information to potential bidders for GNC's assets and deter them from participating in the public auction overseen by the Bankruptcy Court. Moreover, as a remedy for Defendants' allegedly unlawful conversion of the GNC shareholders' assets, Plaintiffs seek, among other things, an order that would divest Defendants of any interest they have acquired through the racketeering enterprise alleged in the Complaint. Though neither GNC nor Harbin are named as defendants here, the relief Plaintiffs seek for the allegedly fraudulent bankruptcy sale puts the Sale Order at issue. Defendants also maintain the Plan's exculpation provisions bar some of Plaintiffs' claims, thus raising defense which would require interpretation of a confirmed plan.

In sum, the Complaint here establishes the requisite "close nexus" between the underlying bankruptcy proceedings and this action to give rise, at a minimum, to "related to" bankruptcy jurisdiction under Section 1334 and thus bring this motion to transfer within the purview of Section 1412.[6]

### B. Transfer Analysis Under Section 1412

The burden is on the movant to demonstrate a transfer of venue is warranted. *Abrams*, 2006 WL 2739642, at *8. Under Section 1412, the Court may order transfer in the "interest of justice," which courts have held is a "broad and flexible" standard to be applied on a case-by-

---

[6] In reaching this conclusion, the Court expresses no view as to the existence of "arising in" jurisdiction pursuant to Section 1334. For purposes of this motion and the applicability of Section 1412 to the transfer analysis this Court must conduct, it is sufficient to conclude this action is related to a Chapter 11 proceeding. This Court therefore need not decide whether the more stringent standard for "arising in" bankruptcy jurisdiction is satisfied here.

13

case basis. *Perno*, 2011 WL 868899, at *3 (citing *Gulf States Exploration Co. v. Manville Forest Prod. Corp.*, 896 F.2d 1384, 1391 (2d Cir. 1990)). To determine whether this standard is satisfied, courts addressing a Section 1412 motion to transfer apply the same multi-factored analysis that informs whether a venue transfer is warranted under Section 1404(a). *See In re Emerson Radio Corp.*, 52 F.3d 50, 55 (3d Cir. 1995) (holding "section 1412 largely includes the same criteria for transfer of cases as section 1404(a)"); *Larami Ltd. v. Yes! Entm't Corp.*, 244 B.R. 56, 61 n.7 (D.N.J. 2000) (noting courts apply factors articulated by the Third Circuit in the context of a Section 1404(a) transfer to transfer motions brought pursuant to Section 1412).

In *Jumara v. State Farm Ins. Co.*, the Third Circuit identified twelve factors encompassing private and public interest concerns relevant to a transfer analysis. 55 F.3d 873, 879-80 (3d Cir. 1970); *see also Abrams*, 2006 WL 2739642, at *9 (listing factors identified by *Jumara* and applying them to determine whether transfer of an action "related to" a bankruptcy case pending in another district was warranted). The private interest factors are: (1) the plaintiff's choice of forum; (2) the defendant's forum preference; (3) whether the underlying claim arose elsewhere; (4) the convenience of the parties based on their relative physical and financial condition; (5) the convenience of witnesses; (6) the location of books and records. *Jumara*, 55 F.3d at 879. The public interest factors are: (1) the enforceability of any judgment obtained by the plaintiff; (2) practical considerations that could make trial easy, expeditious, or inexpensive; (3) administrative difficulty resulting from court congestion; (4) local interest in deciding local controversies; (5) the public policies of each forum; and (6) the familiarity of the trial judge with applicable law. *Id.* at 879-80. While the decision to transfer is a matter for the Court's discretion, courts have consistently held that "the district where the bankruptcy case is pending is [generally] the proper venue for all proceedings 'related to' that bankruptcy case." *Abrams*, at

*9; *Perno*, 2011 WL 868899, at *4 ("Generally, courts have concluded that when civil actions are related to a pending bankruptcy proceeding, there is a presumption that the district where the bankruptcy case is pending is the proper venue."); *see also* 28 U.S.C. § 1409(a) ("a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending.").

Upon consideration of this presumption and the *Jumara* factors, the Court finds transfer of this action to the District of Delaware, where the GNC Bankruptcy Case is pending, would serve the interests of justice and is therefore warranted under Section 1412. The Court will review the relevant factors, grouped according to their bearing on private or public interests.

    1. Private Interest Factors

The private interest factors tip the balance in favor of transfer.

While a plaintiff's choice of forum is typically entitled to deference, *see Jumara*, 55 F3d at 879 (holding that, on a motion to transfer, "the plaintiff's choice of forum should not be lightly disturbed), that deference is diminished when the forum has little connection to the underlying claims. *See Santi v. Nat'l Bus. Records Mgmt. LLC*, 722 F. Supp. 2d 602, 607 (D.N.J. 2010) ("courts give substantially less weight to a plaintiff's forum choice when the dispute at the heart of the lawsuit occurred almost entirely in another state."). Here, the only apparent connection between New Jersey and the events giving rise to Plaintiffs' claims is the fact that one of the named Plaintiffs, Mr. Tang, resides in this state. Defendants' allegedly collusive activities center around the management and bankruptcy proceedings of GNC—a Delaware corporation, which maintained a principal place of business in Pennsylvania at the time relevant to this action. None of the alleged wrongdoing occurred in New Jersey. Indeed, because the action has been filed as a putative nationwide class action, it is only the alleged harm to Mr. Tang which connects this case

to New Jersey. Thus, Plaintiffs' choice of forum does not militate against transfer. In contrast, the forum that Defendants prefer is the location where the crux of the events underlying Plaintiffs' claims occurred. As discussed above, the GNC Bankruptcy Case in Delaware figures prominently in the alleged scheme and underpins Plaintiffs' claims that shareholders were deprived of their equity in GNC as a result of Defendants' alleged RICO enterprise. For this same reason, the third factor, where the claim arose, also weighs strongly in favor of transfer to Delaware, the location where the allegedly "sham" bankruptcy proceedings occurred. To the extent Plaintiffs argue their claim arose in New Jersey because some of Defendants' allegedly fraudulent representations were made in the context of Plaintiff-initiated communications and efforts to prevent the GNC bankruptcy filing, this alleged fact does not shift the core of this case to New Jersey. In actions involving misrepresentations and misleading omissions, such wrongdoing is deemed to occur in the location from which the fraudulent statement or omission itself originated, not where such information is received. *Kerik v. Tacopina*, No. 14-488, 2014 WL 1340038, at *5 (D.N.J. Apr. 3, 2014) (rejecting plaintiff's argument that his calls and emails from New Jersey supported maintaining venue in this district, reasoning that defendant's alleged misrepresentations and omissions occurred in New York, the location in which defendant made them); *see also Metro. Life Ins. Co. v. Bank One, N.A.*, No. 03–1882, 2012 WL 4464026, at *6 (D.N.J. Sept. 25, 2012) ("When examining claims for misrepresentation on a motion to transfer venue, misrepresentations and omissions are deemed to occur in the district where they were transmitted or withheld, not where they are received."). The remaining private interest factors—the convenience of the parties, the convenience of potential witnesses, and access to books and records—have no significant impact on whether the interests of justice or convenience favor transfer, given the geographical proximity of the two venues in question, Delaware and New

Jersey. *See, e.g., Larami*, 244 B.R. at 61 n. 8 (observing, on a Section 1412 motion to transfer venue, that the close proximity of the District of New Jersey and the Delaware Bankruptcy Court did not "suggest a preference for either district").

    2. Public Interest Factors

The public interest factors strongly weigh in favor of transfer.

The first factor, a judgment's enforceability, is an overall neutral consideration in this case. While one Defendant is located in Delaware, it does not appear that the others reside in that state. Thus, there is likely little difference in enforcing any judgment in the competing fora.

However, the other public interest factors decidedly support venue transfer. Efficiency would certainly be served by transferring this action to the district that is already familiar with the circumstances surrounding GNC's decision to file Chapter 11 proceedings to manage its debts and the events of the bankruptcy proceeding itself, elements which play a key role in the RICO, fraud, and breach of fiduciary duty claims Plaintiffs assert in this action. In addition to those case-specific practical concerns, the district courts' relative administrative burdens further support transfer. The transferee court is in a superior position to address this action due to the heavy caseload and congestion in the District of New Jersey, in which pending cases number approximately seven times those pending in the Delaware District Court and Delaware Bankruptcy Court combined, according to the most recently published statistics.[7]

Perhaps most important in this case is the public policy of fostering mutual respect and comity among the district courts in the federal system. This lawsuit, at bottom, assails the integrity of the GNC Bankruptcy Case. Plaintiffs' claims are based in large part on the alleged misuse and manipulation of the bankruptcy process to contrive a sale of GNC's assets to one

---

[7] *See* Federal Judicial Caseload Statistics 2021 Tables, United States Courts, Statistics & Reports (Mar. 31, 2021), https://www.uscourts.gov/statistics-reports/federal-judicial-caseload-statistics-2021-tables.

majority shareholder to the detriment of minority shareholders, whose equity, Plaintiffs allege, was unlawfully wiped out. Plaintiffs aver Defendants' unlawful enterprise not only harmed the shareholders but also essentially perpetuated a fraud on the Delaware Bankruptcy Court. Many of the Complaint's allegations challenge the soundness the Delaware Bankruptcy Court's findings, as set forth in the Sale Order. Moreover, Plaintiffs seek to remedy the alleged wrongdoing detailed in the Complaint by, among other measures, divesting Defendants of the gains acquired through their alleged scheme, including those gains by Defendant CITIC, which the Complaint identifies as a holding company in control of asset purchaser Harbin. Assuming Plaintiffs proved their allegations and prevailed on their claims, any judgment or relief awarded in this case would lead to results inconsistent with orders filed in the GNC Bankruptcy Case and would provoke a clash between the orders of different district courts.

### III. CONCLUSION

In sum, the claims asserted by Plaintiffs here are inextricably intertwined with the GNC Bankruptcy Case. For the foregoing reasons, the Court concludes a transfer under Section 1412 is appropriate and warranted.

Regarding the question of whether this action is transferred to Delaware District Court or, instead, directly to the Delaware Bankruptcy Court, Section 1412 authorizes transfer "to a district court for another district." 28 U.S.C. § 1412. This Court appreciates the efficiency of a direct transfer to the Delaware Bankruptcy Court and acknowledges that some district courts have construed Section 1412 to authorize direct transfer to another district's bankruptcy court. *See e.g., U.S. Vision*, 2012 WL 243358, at *6 (transferring action to the Delaware Bankruptcy Court under Section 1412); *Larami*, 244 B.R. at 61-62 (finding transfer to Delaware Bankruptcy Court warranted under Section 1412). However, others, consistent with the plain language of the

statute, have ordered transfer to another district court, to be referred to bankruptcy court in that transferee district. *See, e.g., Garcia*, 2015 WL 12857080, at *7 n.6 ("rather than transfer the instant action to the Bankruptcy Court, the Court will adhere to the general rule that transfer should be to the District Court for referral to the Bankruptcy Court in that district."); *Perno*, 2011 WL 868899, at *5 (adhering to procedure for Section 1412 transfers to the district court where the related bankruptcy case is pending). The Third Circuit has described the proper procedure, albeit in a slightly different litigation posture, for effecting transfers pursuant to Section 1412 as follows:

> Where a civil proceeding already pending in one district court becomes "related to" a chapter 13 case subsequently filed in another district court, the proper method for transferring the related proceeding to the bankruptcy court hearing the chapter 13 case is to seek a change of venue in the nonbankruptcy forum pursuant to 28 U.S.C. § 1412 and Bankruptcy Rule 7087.[8] After the related proceeding is transferred to the district court wherein the chapter 13 case is pending, then pursuant to 28 U.S.C. § 157(a), the related proceeding may be referred to the bankruptcy court actually hearing the chapter 13 case.

*Maritime Elec. Co.*, 959 F.2d at 1212.[8]

In light of the Third Circuit's guidance, and in the absence of any decisional law construing Section 1412's language to authorize transfers directly to a bankruptcy court, this Court transfers this action to Delaware District Court, where the parties may seek referral to the Bankruptcy Court. An appropriate order will be filed with this Opinion.

    /s/ *André M. Espinosa*
    ANDRÉ M. ESPINOSA
    United States Magistrate Judge

Dated: October 7, 2022

---

[8] Unlike the scenario presented in *Maritime Electric*, the GNC Bankruptcy Case was not "subsequently filed" but rather pre-dates the initiation of this civil action. This sequential distinction does not, however, affect the applicability of the Third Circuit's instruction that, under Section 1412, the related case be transferred to the district court and then referred to bankruptcy court.